ESTATE OF HOWARD H. McCLINTIC, DECEASED, MARGARET McC. McCLINTIC, HOWARD H. McCLINTIC, JR., ROBERT H. McCLINTIC, STEWART McCLINTIC, MARGARET McC. LOVE AND FIDELITY TRUST COMPANY, EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CHARLES D. MARSHALL, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 101197, 101757.   Promulgated June 25, 1942.

*Paul G. Rodewald, Esq.*, for the petitioners.

*Hartford Allen, Esq.*, and *J. Harrison Miller, Esq.*, for the respondent.

196

OPPER: We take as our point of departure the principle of the Sansome case [1] that accumulated earnings and profits of a predecessor corporation are made available for dividend distribution by a successor where its acquisition of the corporate assets is the result of a tax-free reorganization. Respondent relies upon the figures carried on the books of the various corporations involved in the series of transfers which led ultimately to the distribution which raises the present questions; and, tracing through the surplus accounts, which in the main conformed with the tax treatment of the various transactions and culminated in a $12,000,000 book surplus in Pitt Securities, the corporation making the distribution in dispute, concludes that there was ample reserve of earnings and profits to cover the dividend.

If respondent's treatment is correct that is a short and simple formula for disposing of the present proceedings. Petitioners, however, assert that net taxable income and actual earnings and profits available for dividends are two different concepts, and that "Book entries are by no means conclusive and must yield to the actual facts, which in this case are not in dispute." For purposes of discussion we shall adopt this general approach and from that viewpoint examine the transactions which led to the distributions in controversy.

This should begin with the corporation to which we are referring as the Construction Co. and the tax-free reorganization by which McClintic-Marshall acquired that company's stock and simultaneously received a distribution of the bulk of its assets. In December 1926, when this reorganization took place, the Construction Co. had net assets of a value of approximately $65,000,000,[2] though its capital was slightly less than $7,500,000. According to its books it had earnings accumulated during its corporate life of $18,500,000, of which, however, some $1,500,000 had accumulated prior to March 1, 1913, and nearly $4,000,000 represented charges to surplus on the issuance of stock dividends in prior years. The post-1913 accumulations are thus approximately $17,000,000. The impounding of surplus in stock dividends which were apparently nontaxable would not diminish this figure, August Horrmann, 34 B. T. A. 1178, which is, therefore, what we must regard as the accumulated earnings of the Construction Co. available for the declaration of taxable dividends at that time.

The cost of the Construction Co. shares to McClintic-Marshall is asserted [3] to be $65,000,000, that being the value of the Construction

---

[1] Commissioner v. Sansome (C. C. A., 2d Cir.), 60 Fed. (2d) 931; certiorari denied, 287 U. S. 667.

[2] The figures throughout the opinion are approximate. They appear exactly in the findings.

[3] An inconsistency, of course, with the tax treatment which provides that the transferee's basis is that of the transferor. Revenue Act of 1928, sec. 113. This is also a result stipulated by the parties.

Co. assets, and hence of the Construction shares for which the McClintic-Marshall stock was issued. But we can not overlook the simultaneous transfer to McClintic-Marshall of most of the Construction Co. assets, which is stipulated to have been part of the reorganization.

A fundamental principle in the consideration of reorganization problems is that the successive parts of the reorganization should be viewed as a whole. *Helvering* v. *Bashford*, 302 U. S. 454; *Prairie Oil & Gas Co.* v. *Motter* (C. C. A., 10th Cir.), 66 Fed. (2d) 309; *Bassick* v. *Commissioner* (C. C. A., 2d Cir.), 85 Fed. (2d) 8; certiorari denied, 299 U. S. 592; *Muskegon Motor Specialties Co.*, 45 B. T. A. 551, 558. When this is done, McClintic-Marshall is seen to have received some $52,000,000 of miscellaneous assets of the Construction Co., including the stock of six subsidiary companies having a value of $15,000,000. That this $52,000,000 is denominated a "distribution" is of no consequence since the assets concerned were acquired as part of the reorganization, as the parties have stipulated, and were part of what McClintic-Marshall, on petitioners' theory, received for its payment of $65,000,000. As we have already noted, the $65,000,000 is petitioners' figure for the cost of everything that McClintic-Marshall got because the stock which it issued, having no other indication of market value, should be valued according to the petitioners by viewing the stipulated contemporary worth of the assets received for the stock. We can not escape the conclusion, therefore, that $52,000,000 of the stock was paid out and $52,000,000 of miscellaneous assets were received when the transaction as a whole is considered.

Following the theory presented to its logical conclusion, the cost of the miscellaneous assets was $52,000,000 out of the total of $65,000,000 which McClintic-Marshall paid. This, of course, leaves $13,000,000 unaccounted for. But when the entire transaction was concluded McClintic-Marshall held, in addition to the miscellaneous assets, the stock of the Construction Co., which in turn still owned property which the parties have stipulated was worth approximately $13,000,000. By a similar process of reasoning we conclude, therefore, that the remaining $13,000,000 was paid by McClintic-Marshall for the Construction Co. stock. There is thus established a true cost basis for purposes of the computation in which we are now engaged of $13,000,000 and no more [4] for the Construction Co. stock.

This brings us to the occurrence which, in petitioner's view, is the nub of their whole contention. "The most important of the several transactions affecting the earnings of McClintic-Marshall Corporation," they say in their brief, "and on which the outcome of these cases ultimately turns, is the complete liquidation in 1930 of nine of

---

[4] The unrecovered cost as of 1930 of the Construction Co. stock must be further reduced, as petitioners concede, by $2,325,700, representing the interim retirement for cash in that amount of a corresponding block of the Construction Co. stock.

its wholly-owned subsidiary corporations." The point made is that these liquidations, including the six subsidiaries and the Construction Co., resulted in a loss to McClintic-Marshall computed by petitioners at a figure sufficient to eliminate the earned surplus which the Construction Co. carried on its books at the time of the transfer to McClintic-Marshall.

The computations upon which petitioners rest that assertion need not be reproduced in detail. Suffice it to say that they include as the predominant item of unrecovered cost an amount of $29,500,000 or thereabouts attributed to the stock of the Construction Co., a figure which is arrived at by assuming that of the $65,000,000 paid for it only about $34,000,000 was recovered by the receipt of Construction Co. assets in 1926. This assumption in turn, proceeds on the theory that the transfer of these assets was a dividend to the full extent of the Construction Co.'s earnings, and that it wiped these out and at the same time reduced McClintic-Marshall's recovery of its cost by a corresponding figure.

Without this premise the claim of a loss on the liquidation falls. Since, as we have seen, there is no justification for the basic assumption that the cost of the Construction Co. stock was more than the approximate $13,000,000 shown by the net result of the 1926 reorganization, all of its cost and that of the other subsidiaries was recovered by the stipulated value of the assets received in the 1930 liquidation and no loss but in fact a slight profit resulted. It follows that there is no ground for the contention that McClintic-Marshall's earned surplus was wiped out or even impaired when its subsidiaries liquidated.

It by no means weakens the force of what we have already concluded to add that the facts demonstrate how unreal and theoretical is any contention that McClintic-Marshall as a result of the transactions described was any worse off than it had been in the first place. Disregarding theories and technical provisions of the tax law, as we must to accord with petitioners' approach, we see that McClintic-Marshall appears to have acquired all of the stock of the Construction Co., and after becoming the owner of the stock, has effected a complete liquidation of Construction Co. by eventually transferring all of the assets of Construction Co. to itself. It thus received a total of $65,000,000 worth of net assets. Obviously, it has had no loss. It got exactly what it set out to get and has paid for it in its own stock, which stock, at best, was not worth more than $65,000,000. $65,000,000 paid out and $65,000,000 received back results in neither gain nor loss. Thus, actually, McClintic-Marshall had no loss whatsoever upon the acquisition of the assets of the Construction Co. nor upon its liquidation.

What is perhaps a collateral or supplementary consideration is that basically the situation is not to be distinguished from that adjudicated in various aspects by the *Sansome* case and those applying a similar principle. *United States* v. *Kauffman* (C. C. A., 9th Cir.), 62 Fed. (2d) 1045; *Helen V. Crocker*, 29 B. T. A. 773; *Murchison's Estate* v. *Commissioner* (C. C. A., 5th Cir.), 76 Fed. (2d) 641; *Fain* v. *Commissioner* (C. C. A., 5th Cir.), 76 Fed. (2d) 1008; certiorari denied, 296 U. S. 588; *Baker* v. *Commissioner* (C. C. A., 2d Cir.), 80 Fed. (2d) 813, affirming 28 B. T. A. 704; *Corrigan* v. *Commissioner* (C. C. A., 3d Cir.), 103 Fed. (2d) 1010; certiorari denied, 308 U. S. 576; *Stanton Corporation*, 44 B. T. A. 56, 81; *Barnes* v. *United States* (Dist. Ct., E. Dist. Pa.), 22 Fed. Supp. 282. Cf. *Coudon* v. *Tait* (C. C. A., 4th Cir.), 61 Fed. (2d) 904; certiorari denied, 289 U. S. 733; *Harter* v. *Helvering* (C. C. A., 2d Cir.), 79 Fed. (2d) 12, 13.

* * * These cases hold that, where there has been a reorganization in which the stockholders of an old company have received stock in the new corporation in exchange for their stock in the old, and where under the Revenue Act of 1921 the transaction was tax-free, the earnings of the old corporation continue to be earnings in the hands of the new, the distribution of which constitutes a taxable dividend. * * * [*Helen V. Crocker, supra*].

And it is unnecessary to attempt to determine whether here the successor achieved the predecessor's earned surplus when the latter's stock was acquired, on the one hand, or when its assets were completely transferred, on the other. For at least upon the liquidation of the subsidiaries McClintic-Marshall received a full distribution of all of the assets originally held by the Construction Co. Cf. *Harter* v. *Helvering, supra; Coudon* v. *Tait, supra.*

Petitioners, in effect, are seeking to avoid the *Sansome* result by reliance on a procedure involving the asserted declaration of a dividend to wipe out accumulated gains and profits which in the absence of such a "distribution" would have been available for dividend purposes to the predecessor corporation before the reorganization and to the successor afterward. But there is nothing to show that, when the Construction Co. transferred assets to McClintic-Marshall, this was a dividend. True, the provisions of section 115 of the Revenue Act of 1928, that any distribution is presumed to be out of earnings and profits, would lend the argument weight in other connections. But the trouble with this assertion here is that it is in violation of the fundamental principle advanced by petitioners that provisions of the revenue act are immaterial in the computation of accumulated earnings available for the distribution of dividends. And, in any event, we are not prepared to grant that the underlying principle responsible for the conclusion reached in *Commissioner* v. *Sansome* can be so readily and narrowly restricted.

After the liquidation of the subsidiaries, McClintic-Marshall transferred a part of its assets to the corporation we are calling Union and the remainder, after a brief interval, to the Bethlehem Steel Corporation in exchange for some of its stock and other considerations. This was distributed and McClintic-Marshall liquidated. Among the assets which Union thus acquired was stock in a corporation named "The Koppers Company," subsequently exchanged by Union for a proportionate part of the shares of an association of the same name. Soon after, Union transferred a part of its assets to Pitt Securities, distributing the latter's stock received in exchange to its stockholders in liquidation. In the following year Pitt Securities made the disputed distribution to these petitioners, which was a dividend if, as respondent contends, there were earnings and profits available to cover it. The part of McClintic-Marshall's assets transferred to Union was approximately 67 percent of the whole; the Koppers Co. stock represented roughly 82½ percent of all of Union's assets; and the assets Union transferred to Pitt Securities were approximately 65 percent of its entire property.

While accepting the doctrine of the *Sansome* case when applied to a complete transfer which leaves the predecessor corporation without assets, petitioners resist its application if the transferor retains property which is sufficient to cover the amount of its undistributed earnings. In this case they say it should be concluded that the old corporation has retained its earnings and profits and that consequently none are available for distribution by the transferee. Thus it is contended that in the transfer to Union that company received no part of McClintic-Marshall's accumulated earnings and could not pass them on to Pitt Securities, its successor. Without the earnings so inherited the operations of Union and Pitt Securities produced insufficient earned surplus to cover the disputed distributions.

There is, however, a reason for rejecting the argument, which we must consider, if not as such, then as the principle by which the accumulations are to be attributed to the respective corporations. An asset does not ordinarily partake of a character permitting its classification as between capital on the one hand and surplus on the other, and it is not the practice to maintain books of account or balance sheets in such a way that a division of this nature can be made by inspection of the asset or of its accounting treatment. See *Canal & Banking Co.* v. *New Orleans*, 99 U. S. 97. For all that will generally appear, and the present proceeding is no exception, the capital assets as a whole will incorporate the combined attributes of stated capital and paid-in or accumulated surplus. In the absence of other means of allocation it is difficult to avoid treating each asset similarly so that it will be considered as including its proportionate share of the over-all division between capital and surplus. Thus, if there is

a transfer to two new corporations and it is necessary to ascertain the amount of accumulated earnings available to each, the principle of proportionate allocation is applicable.] *Murchison's Estate* v. *Commissioner*, *supra*, and *Fain* v. *Commissioner*, *supra*, affirming memorandum opinions of this Board. [The same reasoning would justify a similar allocation between capital and surplus when assets are partly retained and partly transferred from one corporation to another in a tax-free reorganization.] *Barnes* v. *United States, supra*.

[On the other hand, if a transferor corporation retains anything, the assumption could well be made that it would first assure its capital and that if it is to be presumed that anything is retained as between capital and surplus it would be the former. Petitioners say "The argument made in the *Sansome* line of cases, that transfer of earnings by reorganization is necessary to prevent escape from taxation, is, as we have shown, not applicable to split-off reorganizations such as those here involved." Our doubt as to the correctness of this claim can be briefly illustrated. Suppose a corporation desires to get accumulated earnings into the hands of its stockholders without subjecting them to the tax on dividends. If petitioners are correct all that would be required would be for the old corporation to transfer assets to a new one, equivalent to the amount of the proposed distribution, and distribute to its shareholders the new company's stock, which would be both tax-free, section 112, and expressly precluded from affecting the subsequent distribution of earnings.[5] If the principle of the *Sansome* case does not govern, as petitioners urge, because the old corporation has transferred only a part of its assets, then the argument of the taxpayer in the *Sansome* case, which was rejected there, would now become valid with the result that a distribution by the new corporation would be considered a payment from its capital and hence not a taxable dividend. And this process could be repeated as many times as the old corporation desired to organize a new company to acquire its most recently accumulated earnings instead of declaring any dividends itself, at least until the shareholders had thereby recovered the cost of their shares.

Thus, except for the doctrine of the *Sansome* case that assets which do not remain in the old corporation will be considered to have endowed the successor with earnings and profits to the extent of those of the predecessor, a tax avoidance identical in kind if not in degree with that condemned in the *Sansome* case could be made possible by "split-off" reorganizations. This reasoning might require

---

[5] SEC. 112. RECOGNITION OF GAIN OR LOSS [Revenue Act of 1928].

  *       *       *       *       *       *       *

(h) *Same—Effect on future distributions.*—The distribution, in pursuance of a plan of reorganization, by or on behalf of a corporation a party to the reorganization, of its stock or securities or stock or securities in a corporation a party to the reorganization, shall not be considered a distribution of earnings or profits within the meaning of section 115 (b) for the purpose of determining the taxability of subsequent distributions by the corporation.

that in the case of such a reorganization the theory of the *Sansome* case should be employed so far as to consider that all accumulated earnings have been transferred to the successor corporation if the assets transferred are equal in value to the amount of accumulated earnings, should that be necessary to give effect to the statutory purpose.

But, as we have seen, there is justification for holding merely that under such circumstances an allocation of accumulated earnings should be made as between assets retained and those transferred; so that the accumulated earnings acquired by the new corporation will be that proportion of the total accumulations which the assets acquired are of the total assets; and for our purposes it will be sufficient if this method of allocation is used in dealing with the transfers through which the assets passed from McClintic-Marshall to Union and from Union to Pitt Securities, the corporation responsible for the distribution to these petitioners which raises the instant questions. We are convinced that the *Sansome* principle governs at least to that extent.[6]

One further point requires discussion. It is suggested that at least the same principle of allocation of earnings must be applied to Union in its exchange of Koppers Co. stock for that of the Koppers Association and that if this is done the bulk of Union's earnings were transferred to the association and did not remain available for subsequent transfer in the reorganization between Union and Pitt Securities. But we think the Koppers transaction was of a different kind from the other reorganizations being considered, and that none of Union's earnings were thereby transferred.

The *Sansome* decision is predicated on the thought that a tax-free exchange does not operate to "break the continuity of the corporate life," and that therefore when a reorganization "does not toll the company's life as continued venture" the earnings of the "original, or subsidiary, company remain * * * 'earnings or profits' of the successor, or parent." This is because such reorganizations do not

---

[6] It is evident that on either theory the provisions of 112 (h) (see footnote 5, supra) would be necessary to avoid an argument by the stockholders that the new stock, even though tax-free under section 112, represented a distribution of the old earnings and profits, however allocated between the corporations, with a corresponding reduction of earned surplus available for future distribution. See Treasury Department statement prepared for use by Senate Finance Committee March 6, 1924, Seidman "Legislative History of Federal Income Tax Laws," p. 696. The precautionary formula invoked by section 112 (h) would prevent this method of tax avoidance in the case of a split-off reorganization through distributions of the earnings allocated to either the old or the new corporation. The section makes no attempt to deal with the division of earnings as between transferor and transferee and this may well be the explanation of the use of the ambiguous "the corporation" as the last two words of the section. See clarifying amendment to the cognate section of the 1936 Act, section 115 (h); Senate Report, 74th Cong., 2d sess., No. 2156, p. 19. See Senate Report, 75th Cong., 3d sess., No. 1567, p. 18, which states in part: "Consequently, such earnings or profits remain unimpaired out of which taxable dividends may subsequently be declared * * * by another corporation which * * * takes in whole or in part the transferor's basis, so that the earnings or profits of the transferor corporation become in whole or in part the earnings or profits of such other corporation."

"result in any 'gain or loss' to the shareholder participating in them."

Thus when the shareholders in McClintic-Marshall received stock of Union in lieu of a portion of what their McClintic-Marshall stock had theretofore represented there was a continuity of the corporate life of the McClintic-Marshall-Union corporate enterprise. Union carried on a part of the business theretofore carried on by McClintic-Marshall and with a portion of its assets, and no gain or loss was recognized when the stockholders' investment in such assets and business, formerly represented by their stock in McClintic-Marshall, was exchanged for Union's shares. The continuity, however, was between the two corporate businesses, and the transfer of earnings under the *Sansome* principle affected them. It did not involve the shareholders, and it would be anomalous to say that any of the shareholders' earnings were taken over and became part of the old enterprise in its new form.

On the other hand, when Union, as a stockholder in the Koppers Co., exchanged that stock for shares of the new Koppers Association, the continuity of corporate life with which an application of the *Sansome* principle would be concerned was that between the two Koppers companies. The earnings of the old would remain such in the hands of the new. But there was no continuity of corporate life as between Union and the new Koppers Association. The latter, we must assume, carried on the corporate business of the old Koppers Co., not that of Union.

Hence, the only result of the Koppers exchange material here is that possibly Union's earnings, which were in the neighborhood of $15,000,000 before the transfer, were decreased by $2,500,000 because the new Koppers shares were worth only $35,000,000, whereas Union's basis for the shares given up in exchange was $37,500,000. The earnings which, under the *Sansome* doctrine, would find their way to the new Koppers association, would be those of its predecessor, the old Koppers company, whose corporate life it continued. They were not those of the predecessor's stockholder, Union, which continued to hold its own earned surplus unimpaired, any more than they would have been had Union been an individual instead of a corporation.

The conclusions we have reached make it unnecessary to consider any other issues. We have taken the view that, mainly by total or proportionate acquisition through nontaxable reorganizations from antecedent companies, Pitt Securities had on hand prior to the distribution to these petitioners earnings and profits of its own or of predecessor corporations which were available to it to cover the entire dividend then paid. This will still be true if all the other matters in controversy are decided in petitioners' favor. The computation upon which this statement rests appears at the conclusion

of our findings of fact and need not be repeated. The result is that respondent's action in charging these petitioners with the receipt of a dividend to the full extent of the amounts received from Pitt Securities was correct and should be sustained.

Reviewed by the Board.

*Decision will be entered for the respondent.*